UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRAINTREE LABORATORIES, INC., ) <br> BRAINTREE HOLDINGS, and ) <br> BRAINTREE REAL ESTATE MANAGEMENT ) <br> COMPANY, LLC, ) <br> ) <br>      Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> CITIGROUP GLOBAL MARKETS INC., and ) <br> CITI SMITH BARNEY, ) <br> ) <br>      Defendants. ) <br> ) | Civil Action No: |

## COMPLAINT

Plaintiffs Braintree Laboratories, Inc. ("Braintree Laboratories"), Braintree Holdings, and

Braintree Real Estate Management Company, LLC ("BREMCO") (collectively, the "Braintree

Entities"), by their attorneys, as and for their complaint against the Defendants Citigroup Global

Markets Inc. ("CGMI") and Citi Smith Barney ("Citi Smith Barney") (collectively "Citigroup"),

state as follows:

### Nature of the Action

1.    While facing criminal and administrative investigations into its fraudulent sales of

"auction rate securities," Citigroup concealed from regulators and customers its continued sales

of such toxic instruments by means of false and misleading descriptions, and also destroyed

relevant evidence concerning its wrongdoing.  After the failure of the auction rate securities

markets in or about February 2008, the United States Securities and Exchange Commission

("SEC") and various state regulators pursued investigations into Citigroup's conduct and found

that it had misrepresented to tens of thousands of customers that the auction rate securities it underwrote, marketed, and sold served as safe, highly liquid "money market" investments.

2.      As late as August 6, 2008, the day before Citigroup publicly announced its partial settlement with the SEC and certain state securities regulators, Citigroup sold auction rate securities to the Braintree Entities, without identifying them as auction rate instruments, instead characterizing them as "seven day rolls," which Citigroup described further as government-backed "money market" investments that could be sold at par at any time on seven days' notice. In reality, these instruments consisted of illiquid auction rate securities, subject to failed auctions, not redeemable until the year 2030.

3.      Between in or about June 2008 and in or about August 2008, Citigroup sold to the Braintree Entities a net amount of approximately $33,200,000.00 in auction rate securities. Since that time, Citigroup has failed to accept the Braintree Entities' demands for rescission of the transactions. Instead, Citigroup has frivolously invoked its settlement with government authorities as a defense, improperly relying on those terms as a shield against appropriate remedies in this matter. In reality, Citigroup's settlements with government agencies expressly acknowledged the rights of those who had been misled into buying auction rate securities, including the right to pursue "any remedies" against Citigroup available under the law.

4.      In connection with the pertinent sales of auction rate securities to the Braintree Entities, Citigroup acted with criminal and flagrant indifference to the rights, interests and property of the Braintree Entities and the public. The June 2008 through August 2008 sales of auction rate securities ran parallel to both Citigroup's internal investigations into its fraudulent marketing practices and its negotiations with multiple government agencies. These sales to the Braintree Entities resulted from ongoing fraudulent practices, contrary to any and all

representations by Citigroup or its lawyers to government agencies regarding the quality and adequacy of Citigroup's compliance and remediation efforts.

5.      The pertinent sales to the Braintree Entities also fell close in proximity to Citigroup erasing recordings of conversations involving employees at its auction rate desk.  At the time that Citigroup recorded over tape recordings involving certain auction rate activities, at least one government agency had already served a subpoena on Citigroup calling for production of those and related materials.  When engaging in these acts of spoliation of evidence and obstruction of justice, Citigroup acted willfully and with scienter.

6.      As a result of its wrongdoing, Citigroup is liable to the Braintree Entities for the full price at which it sold the auction rate securities, as well as consequential and other compensatory damages, treble and/or punitive damages, and prejudgment interest at up to the annual rate of 12% under Massachusetts law, along with an award of reasonable attorneys' fees and costs.

**Jurisdiction and Venue**

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claims herein occurred in this District, and Citigroup does business and is registered with the Commonwealth of Massachusetts to do business in this District.  In addition, in filings submitted by Citigroup to the Commonwealth of Massachusetts, Citigroup has submitted to venue and jurisdiction in courts located in Massachusetts.

**Parties**

9.      Plaintiff Braintree Laboratories, Inc. is a Massachusetts corporation with its principal offices located at 60 Columbian Street West, Braintree, Massachusetts.  Braintree

Laboratories is a specialty pharmaceutical company focused on the development and commercialization of products for the gastroenterology field.

10.     Plaintiff Braintree Holdings is a Massachusetts voluntary trust with its principal offices located at 60 Columbian Street West, Braintree, Massachusetts, and its trustees are citizens of Massachusetts and New Hampshire.

11.     Plaintiff Braintree Real Estate Management Company, LLC is a Delaware limited liability company, registered to do business in Massachusetts with its principal offices located at 60 Columbian Street West, Braintree, Massachusetts, and its member is a citizen of Massachusetts.

12.     Defendant CGMI is a Delaware corporation and a wholly-owned brokerage and securities subsidiary of Citigroup Inc., with its headquarters located in New York.  CGMI is a broker-dealer registered with the SEC, with the Secretary of the Commonwealth of Massachusetts, and as a member of the Financial Industry Regulatory Authority ("FINRA"). CGMI has underwritten and sold auction rate securities to retail and other customers located throughout the United States.

13.     Defendant Citi Smith Barney is a Delaware corporation with its principal place of business in New York.  Citi Smith Barney operates as a division of CGMI, providing global brokerage, investment banking, and investment advisory services and advice to clients.

## Citigroup's Registrations in Massachusetts

14.     At all relevant times, Citigroup has been registered with the Commonwealth of Massachusetts as a broker-dealer of securities.  Citigroup has regularly executed and submitted to the Commonwealth of Massachusetts registration forms including Form BD, the Uniform Application for Broker-Dealer Registration (the "Massachusetts Form BD").

4

15.   Pursuant to the Massachusetts Form BD that Citigroup has executed and submitted in order to do business in the Commonwealth:

> [f]or the purposes of complying with the laws of the [Commonwealth of Massachusetts] relating to either the sale or offer of securities or commodities, the undersigned and applicant hereby ... irrevocably appoint the administrator of each of those State(s) [including the Commonwealth of Massachusetts] ... attorney for the applicant in said State(s), upon whom may be served any notice, process, or pleading in any action or proceeding against the applicant arising out of or in connection with the offer or sale of securities or commodities, or out the violation or alleged violation of the laws of [the Commonwealth of Massachusetts], and the applicant hereby consents that any such action or proceeding against the applicant may be commenced in any court of competent jurisdiction and proper venue within [the Commonwealth of Massachusetts] by service of process upon said appointee with the same effect as if the applicant were a resident in [the Commonwealth of Massachusetts] and had lawfully been served with process in said State(s).

16.   At all relevant times, Citigroup has been registered with the Commonwealth of Massachusetts as an investment adviser by submitting to, and maintaining with the Commonwealth a Form ADV, the Uniform Application for Investor Adviser Registration (the "Massachusetts Form ADV"). In the Massachusetts Form ADV, Citigroup appointed the legally designated officers of the Commonwealth of Massachusetts as its agents to receive service of process in any action based on the laws of, among other places, the state in which it was "applying for registration or amending [its] registration," namely, the Commonwealth of Massachusetts.

17.   These undertakings by Citigroup became part of any and all relevant agreements with any and all of the Braintree Entities.

18.   On or about March 31, 2009 Citigroup filed an amended Massachusetts Form ADV and on or about April 3, 2009, Citigroup filed an amended Massachusetts Form BD, which included its submission to actions commenced in courts of competent jurisdiction in the

Commonwealth of Massachusetts and to service of process on the Secretary of the
Commonwealth for such actions.

### Account Openings for The Braintree Entities

19.     On or about July 23, 2001, Citigroup and/or its predecessors opened an
investment account for Braintree Holdings.

20.     By on or about May 6, 2003, Citigroup and/or its predecessors opened an
investment account for BREMCO.

21.     On or about August 3, 2003, Citigroup and/or its predecessors opened an
investment account for Braintree Laboratories.

22.     When opening these accounts, each of the Braintree Entities made clear in writing
to Citigroup and/or its predecessors that liquidity was its primary concern.

23.     When opening these accounts, Citigroup never informed any of the Braintree
Entities that it had already made various undertakings, through official filings with the Secretary
of the Commonwealth of Massachusetts, on Massachusetts Form BD and Massachusetts Form
ADV.  Included in these undertakings by Citigroup and its predecessors was a commitment to
appear in and submit to courts in Massachusetts for actions arising under Massachusetts law.

24.     Contrary to and without disclosing to customers, such as the Braintree Entities,
these undertakings in the Massachusetts Form BD and Massachusetts Form ADV, Citigroup
attempted to impose on customers an arbitration governed by New York law.  The imposition of
an arbitration governed by New York law could deprive Massachusetts residents of a flexible
remedy of rescission available under Massachusetts securities laws, but not under New York
law.

25. Citigroup's failure to disclose to the Braintree Entities its undertakings in the Massachusetts Form BD and the Massachusetts Form ADV constituted material and fraudulent omissions with respect to any otherwise potentially applicable arbitration clauses. Citigroup knowingly, intentionally and recklessly failed to disclose these undertakings.

26. Had Citigroup adequately, reasonably and fully disclosed and described to the Braintree Entities the undertakings by Citigroup in its Massachusetts Form BD and Massachusetts Form ADV, which permitted the Braintree Entities to impose on Citigroup the applicability of Massachusetts law and a Massachusetts judicial forum, none of the Braintree Entities would have agreed in an arms-length transaction to the arbitration and dispute resolution obligations that Citigroup attempted to impose on them.

27. In addition, any potentially applicable arbitration provisions are unconscionable and unenforceable against the Braintree Entities. Among other things, contrary to the representations that Citigroup made to the Secretary of the Commonwealth in the Massachusetts Form BD and Massachusetts Form ADV, and contrary to important public policy concerns in Massachusetts, Citigroup attempted to impose on the Braintree Entities the requirement of an arbitration governed by New York law, thereby purporting to deprive each of the Braintree Entities of judicial remedies in Massachusetts, including a flexible rescission remedy available under Massachusetts securities laws designed to protect investors who reside in Massachusetts.

**Citigroup's Historic Relationship with the Braintree Entities**

28. For more than fifteen years, the Braintree Entities have relied on Citigroup and its predecessors to place cash assets into what the Braintree Entities understood were liquid investments with reasonable rates of return.

7

29.     Throughout that lengthy time period, Citigroup's and its predecessors' registered representatives located in the Commonwealth of Massachusetts have provided investment advice to the Braintree Entities.

30.     All relevant transactions between Citigroup and the Braintree Entities have occurred primarily and substantially in the Commonwealth of Massachusetts.

31.     Based on the historic relationship between Citigroup and the Braintree Entities and communications between them, Citigroup has been and remains well aware of the particular need for liquidity in the operations of the Braintree Entities.

32.     In an account verification profile submitted by each of the Braintree Entities to Citigroup and/or its predecessors in connection with the activities in the pertinent accounts, each of the Braintree Entities listed "liquidity" as its number one investment objective, and described its risk tolerance as "conservative" in its investment profile.

33.     At the relevant times when Citigroup sold auction rate securities to the Braintree Entities, Citigroup knew, recklessly disregarded and should have known that those securities were illiquid and not suitable for its clients, and that those securities were especially unsuitable for the Braintree Entities, but Citigroup made materially false and incomplete statements to the Braintree Entities to convince them otherwise.

### Citigroup's Sales of Auction Rate Securities

34.     Auction rate securities are generally bonds issued by municipalities, student loan entities, and corporations, or preferred stock issued by closed-end mutual funds, with interest rates or dividend yields that were periodically reset through frequent auctions, typically every seven, fourteen, twenty-eight or thirty-five days. The securities are usually issued with maturities of thirty years, but the maturities can range from five years to perpetuity.

35.     The issuer of each auction rate security selected one or more broker-dealers to underwrite the offering and/or manage the auction process.  If the issuer selected more than one broker-dealer, then the issuer designated one of the broker-dealers as the lead broker-dealer which was primarily responsible for managing the auction process.  As a general rule, customers could submit orders for that security only through the selected broker-dealers.

36.     Each participating broker-dealer accepted orders from its customers, as well as from non-participating broker-dealers, and then submitted the orders to the auction agent, which ran the auction.  Customers bid the lowest interest rate or dividend they were willing to accept. The auction cleared at the lowest rate bid that was sufficient to cover all of the securities for sale, and that rate applied to all of the securities in the auction until the next auction.  If there were not enough bids to cover all of the securities for sale, then the auction failed.  If an auction failed, then the issuer paid a default rate to holders, either a predetermined flat rate or a rate set by a pre-determined formula.

37.     At all relevant times, Citigroup regularly, falsely and fraudulently marketed auction rate securities to customers as liquid investments that offered "[c]ompetitive short-term interest rates compared with other money market instruments."

38.     At all relevant times, Citigroup regularly, falsely and fraudulently marketed auction rate securities to its customers, including the Braintree Entities, as money market funds or equivalents, and as liquid investments that could be sold on certain notice by the customers. As a result, some customers invested funds that they might need for short-term requirements, such as business operating expenses, for a down payment on a house, medical expenses, college tuition, or taxes.  Citigroup regularly failed to advise these and other customers that any funds invested in these instruments could become illiquid, possibly for long periods.

39.     According to internal statements at Citigroup, "[f]rom an investor's perspective ... auction rate securities are generally viewed as an alternative to money market funds."

40.     At all relevant times, Citigroup regularly acted with a flagrant indifference to whether its employees underwent adequate training regarding auction rate securities, liquidity risks and auction failures.  Instead, Citigroup encouraged sharp marketing practices.

41.     At all relevant times, Citigroup's management acted culpably when addressing marketing and other practices concerning auction rate securities and/or with a flagrant indifference to whether its employees would engage in fraudulent practices, failing to make proper disclosures to its customers regarding auction rate securities, liquidity issues, and risks surrounding auction failures.

42.     In the rare instances when Citigroup discussed with customers the possibility of failed auctions, Citigroup had a practice of stating that auction rate securities have high, above market, maximum rate resets upon an auction failure, in order to compensate the holder for the lack of liquidity and to create incentives for the issuer to restructure the securities, thereby providing liquidity to the holder.  Citigroup regularly failed to disclose that certain auction rate securities had low, below market, default rate resets.

43.     Prior to February 2008, Citigroup had supported the auctions underlying auction rate securities and, consequently, had never had a failed auction since it began marketing them in the 1980s.

44.     On or about February 12, 2008, Citigroup stopped supporting auction rate securities with low, formulaic default rates, and all of those auctions failed.  Thereafter, Citigroup allowed other Citigroup-managed auctions to fail.

**Government Investigations into Citigroup's Auction Rate Securities Practices**

45.     Since in or about February 2008, Citigroup has faced administrative and criminal investigations into its fraudulent auction rate securities practices.

46.     From no later than in or about April 2008 through at least in or about August 2008, Citigroup remained subject to one or more government subpoenas commanding specifically the production of, among other things, recordings of telephone calls concerning the marketing, sale, distribution or auction of these instruments.

47.     Contrary to its obligations to preserve these recordings, Citigroup erased recordings from its auction rate securities desk and other areas.

48.     Initially Citigroup claimed that such recordings did not exist.  Once the tape(s) containing recorded calls predating the subpoena had been erased and reused, however, Citigroup acknowledged that all calls with the auction rate securities desk had been erased by new recordings.

49.     By spoliating evidence, in the middle of investigations and multi-jurisdictional efforts to resolve regulatory issues, Citigroup destroyed relevant evidence concerning its marketing of and other practices concerning auction rate securities.

**Citigroup's Post-February 2008 Auction Rate Securities Sales**

50.     Even after February 2008, Citigroup continued to engage in false and fraudulent sales of auction rate securities to the Braintree Entities without making adequate risk disclosures or even referring to them as "auction rate securities" or as instruments subject to any sort of "auction" process.  In purchasing auction rate securities from Citigroup after February 2008, the Braintree Entities relied upon misrepresentations that Citigroup made, including but not limited to representations concerning the securities' liquidity and that they could be sold at par at any time on seven days' notice.

11

51.     On or about June 10, 2008, June 17, 2008, June 18, 2008, and July 22, 2008,

Citigroup sold to Braintree Laboratories auction rate securities known as Commonwealth of

Massachusetts General Obligation Bonds Consolidated Loan of 2000 ("Mass 2000 G/O Bonds")

Series D and G, in net transactions totaling $23,975,000.00.

52.     On or about July 23, 2008, and August 6, 2008, Citigroup sold to Braintree

Holdings Mass 2000 G/O Bonds Series D in net transactions totaling $7,825,000.00.

53.     On or about June 25, 2008, and August 6, 2008, Citigroup sold to BREMCO

Mass 2000 G/O Bonds Series D in net transactions totaling $1,400,000.00.

54.     Prior to each of the sales set forth in Paragraphs 51 through 53, nobody at or for

Citigroup informed any of the Braintree Entities that the proposed instruments were "auction rate

securities" or subject to any sort of "auction" processes.  Instead, shortly prior to each post-

February 2008 sale of auction rate securities, in conversations with Tom Kelly and/or Harry P.

Keegan III of and/or for the Braintree Entities, a Citigroup employee named Peter Reneghan held

the instruments out as "seven day rolls," promoting them, and having previously described them,

as safe, liquid, government-backed "money market" investments that could be sold by the

Braintree Entities at par at any time on seven days' notice.  At the time Citigroup made these

representations through Peter Reneghan, Citigroup knew that they were false or recklessly

disregarded their falsity because, among other things, Citigroup knew that the auctions for such

securities had failed, making the securities illiquid.

55.     Citigroup's sales of the particular auction rate securities to the Braintree Entities

set forth in Paragraphs 51 through 53 posed greater risk than those associated with many other

auction rate securities because the default rate that a failed auction triggered fell substantially shy

of a rate that would likely cause the issuer to redeem the securities.  At relevant times, Citigroup

purposely failed to explain adequately these greater risks and purposely avoided using the label "auction rate securities" and even the word "auction."

### Citigroup's Litigation Conduct and Settlement with Regulators

56.     On August 7, 2008, the day after Citigroup's last sale of auction rate securities to any of the Braintree Entities, Citigroup announced a settlement with the SEC and state regulators in connection with its fraudulent conduct in promoting and selling auction rate securities. Citigroup's settlement with the SEC was memorialized in the Consent of Defendant Citigroup Global Markets Inc. (the "SEC Consent"), dated December 13, 2008, which was incorporated into a judgment against Citigroup dated December 22, 2008.

57.     Among other requirements, the SEC Consent permanently enjoined Citigroup from violating the provisions of Section 15(c) of the Exchange Act, and Rule 15c1-2 thereunder, which prohibit the use of manipulative or deceptive devices by broker-dealers.

58.     The court judgment incorporating the SEC Consent resulted from Citigroup's intentional litigation conduct and strategy, as well as arduous negotiations and compromises designed to increase the rights of customers.  The SEC Consent provided that [a]ll customers … may pursue any remedies against [Citigroup] available under the law."  The SEC Consent did not carve out or exclude any form of judicial remedies for customers who did not elect arbitration under the SEC Consent.  Citigroup has regularly used the term "remedies" in its pertinent operations, including account agreements and arbitration provisions, to include the right to trial by jury.  This term of the SEC Consent and other terms of it that benefitted customers became part of the operative agreements between Citigroup and the Braintree Entities.

59.     Notwithstanding the ongoing investigations and negotiations with the SEC and other government agencies, which Citigroup did not disclose to the Braintree Entities, and which

led to the announcement of the settlements by Citigroup on August 7, 2008, Citigroup cleared its

unlawful August 6, 2008 sales of auction rate securities to the Braintree Entities.

### Tender of the Braintree Entities' Auction Rate Securities

60.      Each of the Braintree Entities promptly and timely demanded rescission and

tendered to Citigroup all auction rate securities they still held from the sales solicited by

Citigroup in exchange for par value plus all accrued interest.  Citigroup has refused to accept the

tender, and the Braintree Entities still hold the auction rate securities at issue that Citigroup

unlawfully sold to them after February 2008.

### CAUSES OF ACTION

### Count One

### Rescission and Restitution under Massachusetts Securities Laws

61.      Paragraphs 1 - 60 are realleged and incorporated by reference as if set forth fully

herein.

62.      In marketing and selling the above-described auction rate securities to the

Braintree Entities, Citigroup made untrue statements of material fact and omitted to state

material facts necessary in order to make the statements made, in the light of the circumstances

under which they are made, not misleading.

63.      The Braintree Entities did not know of the falsity of the misrepresentations and

omissions made by Citigroup and, in the exercise of reasonable care could not have known, of

the falsity of such misrepresentations and omissions.

64.      The Braintree Entities have tendered the auction rate securities to Citigroup at

issue in exchange for par value plus all accrued interest, but Citigroup has rejected this tender.

65.     The Braintree Entities are entitled to the rescission of the above described securities transactions pursuant to the Massachusetts Uniform Securities Act, M.G.L. c. 110A, § 410(a)(2).

66.     Citigroup is liable to the Braintree Entities for the recovery of the consideration paid for the securities, together with statutory interest.

**Count Two**

**Rescission and Restitution Based on Fraudulent Inducement**

67.     Paragraphs 1 - 66 are realleged and incorporated by reference as if set forth fully herein.

68.     Each securities transaction set forth in Paragraphs 51 through 53 constituted a contract for the sale of municipal bonds.

69.     To induce the Braintree Entities into those transactions, shortly before each of them, through an employee named Peter Renaghan, Citigroup made material misrepresentations and omissions, describing the securities, to Tom Kelly and/or Harry P. Keegan III of and for the Braintree Entities, as "seven day rolls," and promoted them and having previously described them, as liquid, government-backed "money market" investments that could be sold on seven days' notice, when in fact the instruments were illiquid auction rate securities.

70.     Citigroup knowingly and recklessly disregarded the truth when engaging in these misrepresentations and omissions.

71.     The Braintree Entities reasonably relied on Citigroup's misrepresentations and omissions.

72.     Through rescission and proper monetary compensation, the parties are capable of being returned to the status quo immediately preceding the transactions set forth in Paragraphs 51 through 53.

73.     The Braintree Entities are entitled to rescission of the transactions set forth in Paragraphs 51 through 53, and to full restitution.

## Count Three

### Rescission and Restitution Based on Mutual or Unilateral Mistake

74.     Paragraphs 1- 73 are realleged and incorporated by reference as if set forth fully herein.

75.     Citigroup and the Braintree Entities entered into the transactions set forth in Paragraphs 51 through 53 on the basic material assumption of fact that the securities being purchased were liquid "money market" investments that could be sold upon seven days' notice.

76.     This mistaken basic assumption underlying the transactions renders them unconscionable.

77.     The Braintree Entities are entitled to rescission of the transactions set forth in Paragraphs 51 through 53, and to full restitution because the Braintree Entities were mistaken as to the basic material assumption underlying the transactions, and Citigroup was either mistaken about it or knew or should have known that the Braintree Entities were mistaken about it.

## Count Four

### Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder

78.     Paragraphs 1- 77 are realleged and incorporated by reference as if set forth fully herein.

79.     At all relevant times, by use of means or instrumentalities of interstate commerce, Citigroup (a) employed a device, scheme or artifice to defraud the Braintree Entities by selling them auction rates securities as set forth in Paragraphs 51 through 53, while characterizing them as liquid government-backed "money market" investments that could be sold on seven days'

notice; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading; and/or (c) engaged in acts, practices or courses of business which operated as a fraud and deceit upon the Braintree Entities in connection with the sales and purchases of auction rate securities.

80.     Citigroup acted with scienter and intended that the Braintree Entities rely upon its material misrepresentations. Citigroup's motives included an objective to reduce its own losses and to reduce its inventory of toxic auction rate securities. With regard to the Braintree Entities, Citigroup had a particular opportunity to mislead them because of the nature of the trust relationship that had developed between them. In its actions, statements, and omissions, Citigroup has demonstrated a consciousness of guilt.

81.     The Braintree Entities reasonably relied to their detriment upon Citigroup's material misrepresentations and omissions of material fact by purchasing securities that were in fact neither money market funds nor liquid, and which were worth substantially less than the purchase price. At the time of Citigroup's material misrepresentations and omissions, the Braintree Entities were unaware of their falsity and believed the false and incomplete descriptions to be true. The Braintree Entities would not have entered into these auction rate securities transactions but for Citigroup's material misrepresentations and omissions described above.

82.     By virtue of its conduct, Citigroup violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

83.     As a direct and proximate result of Citigroup's material misrepresentations and omissions, the Braintree Entities suffered direct, indirect and consequential losses and damages,

and continue to suffer losses and damages, in an amount to be proven at trial. Citigroup is liable for the losses and damages suffered by the Braintree Entities, which were reasonably foreseeable to Citigroup and were caused by the concealment of facts and misrepresentations by Citigroup.

**Count Five**

**Breach of Contract**

84.    Paragraphs 1- 83 are realleged and incorporated by reference as if set forth fully herein.

85.    Each securities transaction set forth in Paragraphs 51 through 53 constituted a contract for the sale of liquid government-backed "money market" investments that could be sold on seven days' notice.

86.    The Braintree Entities substantially and fully performed their contractual obligations. All conditions precedent to Citigroup's performance have been satisfied or excused.

87.    Citigroup materially breached its obligations under each of these contracts by selling to each of the Braintree Entities illiquid auction rate securities, which did not function as money market funds, which the Braintree Entities could not sell upon seven days' notice, and which Citigroup failed to sell on seven days' notice.

88.    As a direct and proximate result of Citigroup's breaches, the Braintree Entities have been damaged directly in the amount of $33,200,000.00, and have suffered additional consequential damages or other damages to be proven at trial, for which Citigroup is liable.

**Count Six**

**Breach of the Duty of Good Faith and Fair Dealing**

89.    Paragraphs 1- 88 are realleged and incorporated by reference as if set forth fully herein.

18

90.    As a result of the contracts underlying each securities transaction set forth in Paragraphs 51 through 53, and the historic relationship between Citigroup and the Braintree Entities, at all relevant times, Citigroup owed each of the Braintree Entities an implied duty of good faith and fair dealing.

91.    Citigroup breached its duty of good faith and fair dealing by intentionally deceiving the Braintree Entities in connection with the transactions set forth in Paragraphs 51 through 53, by selling to the Braintree Entities unsuitable securities, and by failing to provide liquidity to the Braintree Entities, such as other members of the industry have attempted to do, for example, through the use of no-cost, no-recourse loans.

92.    As a direct and proximate result of Citigroup's breaches, the Braintree Entities have been damaged directly in the amount of $33,200,000.00, and have suffered additional consequential damages or other damages to be proven at trial, for which Citigroup is liable.

**Count Seven**

**Common Law Fraud**

93.    Paragraphs 1 – 92 are realleged and incorporated by reference as if set forth fully herein.

94.    Citigroup engaged in intentional deceit by making untrue statements of material fact or omitting material facts necessary in order to make the statements made not misleading with regard to the transactions between Citigroup and the Braintree Entities set forth in Paragraphs 51 through 53.

95.    Citigroup knew of or recklessly disregarded the falsity of these untrue statements or omissions of material fact.  Citigroup intended that each of the Braintree Entities rely on the falsity of its statements or omissions.  The Braintree Entities were unaware of the falsity of Citigroup's representations and reasonably relied on them to their detriment.

96.     As a direct and proximate result of Citigroup's material misrepresentations and omissions, the Braintree Entities suffered direct, indirect and consequential losses and damages, and continue to suffer losses and damages, in an amount to be proven at trial.

### Count Eight

### Negligent Misrepresentation

97.     Paragraphs 1 – 96 are realleged and incorporated by reference as if set forth fully herein.

98.     Based upon, among other things, their superior knowledge concerning investment products and services, and the nature of the relationship between Citigroup and the Braintree Entities, Citigroup had a duty to act with honesty and due care in making representations to each of them.

99.     Citigroup made untrue statements of material fact or omitted material facts necessary in order to make the statements made not misleading with regard to the securities that Citigroup sold to the Braintree Entities.

100.    Citigroup failed to act honestly, with due care and reasonably when making untrue statements or omitting material facts in communications with each of the Braintree Entities.  Citigroup intended that each of the Braintree Entities rely on these untrue statements and omissions.  The Braintree Entities were unaware of the falsity of the representations and reasonably relied on them to their detriment.

101.    As a direct and proximate result of Citigroup's material misrepresentations and omissions, the Braintree Entities suffered direct, indirect and consequential losses and damages, and continue to suffer losses and damages, in an amount to be proven at trial.

## Count Nine

## Breach of Fiduciary Duty

102.   Paragraphs 1 – 101 are realleged and incorporated by reference as if set forth fully herein.

103.   At all relevant times, the Braintree Entities entrusted their affairs, as they related to their investment accounts with Citigroup, to Citigroup, and reasonably relied on Citigroup to manage those affairs in good faith and with due regard to the Braintree Entities' best interests.

104.   By virtue of its fiduciary duties, Citigroup was required, among other things, to (a) recommend investments that complied with the Braintree Entities' investment objectives; (b) inform the Braintree Entities of the risks associated with each transaction; (c) refrain from self dealing; (d) refrain from misrepresentations or omissions of material fact; and (d) disclose any personal interest in the transactions.

105.   As a fiduciary, Citigroup owed the Braintree Entities duties beyond mere fairness and honesty; Citigroup was obliged to act in each of the Braintree Entities' best interests. Citigroup owed the Braintree Entities an obligation of diligent and faithful service similar to that of a trustee. Likewise, Citigroup owed the Braintree Entities rigorous duties of loyalty and care, and to avoid acts which put its interests in conflict with those of the Braintree Entities. The duties must be exercised with utmost good faith and integrity, and such skill and judgment as might reasonably be expected of a broker-dealer.

106.   By virtue of its conduct, as set forth above, Citigroup breached its fiduciary duties to the Braintree Entities by engaging in intentional deceit with respect to the sales of auction rate securities from in or about June 2008 through in or about August 2008. Citigroup served its own interests in divesting auction rate securities, at the expense of each of the Braintree Entities' stated priorities of liquidity and other cognizable interests.

21

107.    As a direct and proximate result of Citigroup's misconduct, the Braintree Entities

suffered direct, indirect and consequential losses and damages, and continue to suffer losses and

damages, in an amount to be proven at trial.

### Count Ten

### Suitability / Negligence

108.    Paragraphs 1 – 107 are realleged and incorporated by reference as if set forth fully

herein.

109.    Citigroup is a member of FINRA, and is bound by the FINRA rules.

110.    FINRA Rule 2310 requires that "[i]n recommending to a customer the purchase,

sale or exchange of any security, a member shall have reasonable grounds for believing that the

recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by

such customer as to his other security holdings and as to his financial situation and needs."

111.    Additionally, SEC Rule 10b-5 prohibits a broker from purchasing securities

unsuited to the buyer's needs, where the broker knows or reasonably should believe that the

securities are unsuited to the buyer, and the broker makes material misrepresentations or fails to

disclose material information, and proceeds to recommend or purchase the securities.

112.    The Braintree Entities disclosed to Citigroup in writing that its number one

investment objective was "liquidity" and described itself as "conservative" in its investment

profile.

113.    At all relevant times, Citigroup was aware of the Braintree Entities' financial

situation, liquidity needs and specifications.

114.    Citigroup recommended the above described auction rate securities to the

Braintree Entities without reasonable grounds for believing that those investments were suitable

for the Braintree Entities and, when so doing, Citigroup otherwise failed to meet industry standards and to fulfill the duty of reasonable care it owed to each of the Braintree Entities.

115.   In fact, the auction rate securities sold by Citigroup to the Braintree Entities, as set forth in Paragraphs 51 through 53, were not suitable because, among other things, they were illiquid and not money market funds.

116.   As a direct and proximate result of Citigroup's misconduct, the Braintree Entities suffered direct, indirect and consequential losses and damages, and continue to suffer losses and damages, in an amount to be proven at trial.

**Count Eleven**

**Conversion**

117.   Paragraphs 1 – 116 are realleged and incorporated by reference as if set forth fully herein.

118.   Citigroup exercised control over the Braintree Entities' investments and cash by reason of its relationship with each of the Braintree Entities and its superior knowledge and authority in the area of investments.

119.   Citigroup engaged in intentional deceit and intentionally used its control and authority to recommend auction rate securities to the Braintree Entities and to invest millions of the Braintree Entities' dollars in auction rate securities.

120.   As a result of Citigroup's intentional deceit and manipulation of the auction rate securities markets, and ultimately withdrawing its support, the auction rate securities that Citigroup sold to the Braintree Entities' were illiquid.

121.   Because all of the auction rate securities held by the Braintree Entities are illiquid, the Braintree Entities are deprived of the use of their cash for an indefinite period of time.

122.    As a direct and proximate result of Citigroup's intentional deceit and conversion, the Braintree Entities suffered direct, indirect and consequential losses and damages, and continue to suffer losses and damages, in an amount to be proven at trial.

## Count Twelve

### Violation of M.G.L. c. 93A

123.    Paragraphs 1 – 122 are realleged and incorporated by reference as if set forth fully herein.

124.    Citigroup's conduct constitutes unfair and deceptive acts and practices in the conduct of trade or commerce in violation of M.G.L. c. 93A, §§ 2 and 11.

125.    Citigroup's unfair and deceptive acts and practices occurred primarily and substantially in the Commonwealth of Massachusetts.

126.    Citigroup acted knowingly, intentionally and willfully when it violated M.G.L. ch. 93A, §§ 2 and 11.

127.    As a direct and proximate result of Citigroup's misconduct, the Braintree Entities suffered direct, indirect and consequential losses and damages, and continue to suffer losses and damages, in an amount to be proven at trial.  In addition, the Braintree Entities are entitled to treble damages and reasonable attorneys' fees and costs in an amount to be proven at trial.

## Count Thirteen

### Punitive Damages

128.    Paragraphs 1 – 127 are realleged and incorporated by reference as if set forth fully herein.

129.    In the event that New York law applies to this matter or to any issues under principles of depecage or otherwise, in addition to compensatory damages, punitive damages against Citigroup are warranted in this case because Citigroup's misconduct evinced a high

degree of moral turpitude and Citigroup has acted with such wanton dishonesty as to imply a criminal indifference to the rights of the Braintree Entities and the public generally.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that the Court

A.  on Counts One, Two and Three, grant rescission of the transactions set forth in Paragraphs 51 through 53 and full restitution in favor of each of the Braintree Entities;

B.  on Counts Four through Twelve, award each of the Braintree Entities direct, indirect and consequential damages in the amount proven at or before trial;

C.  on Count Twelve, award each of the Braintree Entities treble damages, reasonable attorneys' fees, and costs;

D.  on Count Thirteen, award each of the Braintree Entities punitive damages;

E.  award each of the Braintree Entities prejudgment interest in the amount of 6% for any damages awarded under the Massachusetts Uniform Securities Act;

F.  pursuant to M.G.L. c. 231, § 6C, award each of the Braintree Entities prejudgment interest in the amount of 12% per annum, or other statutory interest under applicable securities laws, or alternatively 9% under New York law, CPLR 5001[a]; 5004; and,

G.  award each of the Braintree Entities post-judgment interest, exemplary damages, reasonable attorneys' fees, and costs, along with such other and further relief as this Court deems just and appropriate under the circumstances.

**<u>Jury Trial Demanded</u>**

Plaintiffs hereby demand a trial by jury on all issues so triable.


Respectfully submitted,

BRAINTREE LABORATORIES, INC.,
BRAINTREE HOLDINGS, and
BRAINTREE REAL ESTATE MANAGEMENT
COMPANY, LLC,

By their attorneys,


/s/ Barry S. Pollack
Barry S. Pollack (BBO#642064)
  (bpollack@sandw.com)
Joshua L. Solomon (BBO#657761)
  (jsolomon@sandw.com)
Phillip Rakhunov (BBO#663746)
  (prakhunov@sandw.com)
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800 (phone)
(617) 338-2880 (fax)


Dated:  April 16, 2009